R. R. Rush, Asst. U. S. Atty., of Roanoke, Va., for plaintiff.

### RUDISILL v. CHESAPEAKE & O. RY. CO.
### Civil Action No. 318.

District Court, W. D. Virginia, at Roanoke.

Oct. 14, 1947.

J. M. Perry, of Staunton, Va., for defendant.

PAUL, District Judge.

This action is one in which the plaintiff, a veteran of the recent war, invokes the provisions of Selective Service Act of 1940, § 308, Title 50 U.S.C.A.Appendix, which is to the effect that any person, who in order to perform military training and service has left a position under a private employer and after discharge from such service makes application for re-employment, shall be restored to such position or to a position of like seniority, status and pay.

The facts in the case are stipulated and may be stated as follows: For several years prior to the war the plaintiff had held a position with the defendant as a telegrapher, which position was other than temporary. After the outbreak of the war, and in due course, the matter of plaintiff's classification came before the Selective Service Board of the city of Clifton Forge, as a result of which the plaintiff, on July 24, 1942, was granted deferment from military service to January 24, 1943, on occupational grounds. This classification was at defendant's request and because the defendant considered that the retention of plain-

tiff in his civilian position was necessary in carrying on the duties imposed on the defendant by the war. 50 U.S.C.A.Appendix, § 305 (k). This deferment was extended by the local Board and at defendant's request over successive periods, which, and the events succeeding which, are set out in the stipulation of facts as follows:

"On January 8, 1943, to July 7, 1943;

"On July 9, 1943, to January 8, 1944;

"On January 11, 1944, to July 8, 1944;

"On July 27, 1944, after an appeal by the employer to the State Director of Selective Service, extended to October 26, 1944.

"On October 4, 1944, the employer requested a further extension from the Local Selective Service Board; and

"On January 24, 1945, to April 5, 1945; and

"Again at the employer's request of the Local Board, on April 5, 1945, to September 26, 1945;

"On April 10, 1945, plaintiff, after having previously requested his Local Board to induct him, requested his Local Board to induct him. The Local Board classified plaintiff 1-A on July 19, 1945. Defendant appealed and the Appeal Board on August 2, 1945, ordered plaintiff's deferment continued;

"(On July 19, 1945, the Local Board having requested reclassification advice, which was furnished July 21, 1945);

"On August 9, 1945, plaintiff was deferred until September 26, 1945, and thereafter, until September 26, 1945, was not called by his Local Board to perform active duty or service with the armed forces, and until said September 26, 1945, the plaintiff's classification was not changed.

"(5) While the plaintiff was so deferred until September 26, 1945, as aforesaid, the plaintiff's immediate superior received a letter signed by the plaintiff, dated August 9, 1945, reading as follows:

" 'In order that I can establish myself in a non-essential status, so I might be drafted into military service, please accept this letter as my resignation, effective immediately. All further communications with

me should be addressed to the following address: Box 214, White Sulphur Springs, West Virginia.'

"On August 19, 1945, while still deferred, the plaintiff wrote to the Local Board at Clifton Forge, requesting that he be made available for service in the armed forces, and on August 23, 1945, while yet deferred, volunteered for induction. On September 26, 1945, upon which day the said deferment ended, the plaintiff was ordered to report for induction, and on October 8, 1945, was inducted;"

It appears that prior to August 10, 1944, the plaintiff was regularly assigned as a telegraph operator at Charlottesville, Virginia, but that on that date the plaintiff, because of personal reasons, informed defendant that he desired to return to Clifton Forge and work from the "extra list" at that place. It appears also that, under the agreement and rules covering telegraph operators, an employee may give up a regular assignment, such as plaintiff then held, and go upon the "extra list" without loss of seniority. The plaintiff having indicated this desire, he was, on August 17, 1944, relieved of duty at Charlottesville and returned to Clifton Forge, where he went on the "extra list." Thereafter he worked in this position until he resigned on August 9, 1945.

On April 1, 1946, plaintiff was discharged from the army and on April 21, 1946, requested that he be returned to work with restoration of his former seniority rights. He was offered immediate employment but was informed that he could not be restored to his seniority because he had resigned his previous position and that he would have to come back as a new man. The plaintiff protested this and refused to accept employment except upon the condition that his seniority be restored. Nevertheless on November 5, 1946, the plaintiff accepted employment with defendant as a telegrapher, without his former seniority, and from that time on has been, and now is, so employed.

It is further stipulated as follows:

"If the plaintiff had been restored to service on April 28, 1946, on said extra list as theretofore he had been employed, with

his seniority rights unimpaired, the plaintiff would have been in line for a regular position, provided that the plaintiff elected to take such position. If the plaintiff had been so restored, it would have been on said extra list, upon which he was at his own request, and the plaintiff could be assigned by the defendant to a regular position or to work in any position, only if the plaintiff chose to take such work.

"The plaintiff, if he had been so restored, might have been eligible for the job of 'third trick telegrapher' in 'F' office at Clifton Forge, Virginia; as this job was up for bidding after the plaintiff left the defendant's service, and was assigned to a man with less seniority than the plaintiff, that is, if the time of the plaintiff's military service is taken into consideration as accounting on his seniority. But, in order for the plaintiff to become eligible for this job, the plaintiff would have to conform to certain requirements of the 'Collective Bargaining Agreement', to which the defendant, and, as a member of the union, the plaintiff were parties, among which requirements was a requirement to the effect that the plaintiff would select a position to which his seniority entitled him within thirty days from the date of his return to work from military service.

"The plaintiff would testify, if called as a witness, that his intention was to comply, and he would have complied, with all requirements to bid for such job, if upon his application for reemployment with the defendant he had been granted such reemployment with full seniority rights.

"The rate of pay of 'F' position, from April 21, 1946, the date upon which the plaintiff applied for reemployment, to May 22, 1946, was $9.20 per day. On May 22, 1946, said rate was increased to $9.40 per day.

"A person working on the extra list takes the rate of pay of the position in which such person chooses to work on the particular day when he is called to work."

The plaintiff sues for restoration to the position which he would have been eligible to, and which he states he would have taken, had his seniority been preserved; and for compensation applicable to such position from April, 1946, until such time as he may be restored thereto.

The statute which plaintiff invokes is applicable to any person "who, in order to perform such training and service, (i. e., in the land or naval forces) has left or leaves a position, other than a temporary position, in the employ of any employer." 50 U.S.C.A.Appendix, § 308(b), Selective Service Act of 1940.

The defendant contends that the resignation of his position by the plaintiff, at the time and under the conditions hereinbefore set out, did not constitute a leaving of his position in order to perform military training and service, within the meaning and intendment of the statute. While it does not appear to be set up in the answer, a further matter of defense is set out in the stipulation of facts and is argued by counsel for defendant; namely, that plaintiff is a member of a labor union (The Order of Railway Telegraphers) which is the bargaining representative for the craft to which plaintiff belongs; that the defendant has a contract with the union in which, among other things, the seniority rights of employees are defined and governed; that plaintiff's rights under his contract of employment are conditioned upon the terms of this collective bargaining agreement and that, under the terms of that agreement, as construed by the union itself, which was and is the designated bargaining representative of the plaintiff, the plaintiff by his resignation in August, 1945, forfeited all rights of seniority. The result being that any restoration of plaintiff's claimed seniority will be considered by the union as a breach of its contract with the defendant and expose the latter to such action as the union may take because thereof. In the view which the court takes of this case it is not necessary to consider this latter defense.

■ It is clear that in enacting the Selective Service Act of 1940 the purpose of Congress was not limited merely to the recruitment of men for the military and naval forces. The act had the broader purpose of arraying the man-power of the nation and utilizing it for whatever activ-

ities, whether military or civilian, as might be necessary to the national safety. The purpose was not only to pick men for the army and navy but also to determine those who, in a time of war or threatened war, could serve with greater value to the country outside of the armed forces. Without attempting to quote the various provisions of the act, attention may be drawn to some of those which indicate this purpose.

While Section 2 of the act, 50 U.S.C.A. Appendix, § 302, provides that only those between the ages of eighteen and forty-five years should be liable for training and service in the armed forces, nevertheless every male citizen between eighteen and sixty-five was required to register. 50 U.S.C.A.Appendix, § 302. All registrants, including those above military age were required to return the questionnaires directed to them by which it was sought to determine their availability on a voluntary basis for service in capacities contributing to the national defense.

By Section 5 of the act, 50 U.S.C.A.Appendix, § 305(e) (1), the President was authorized, under appropriate regulations, to provide for the deferment from service in the armed forces of all men "whose employment in industry, agriculture, or other occupations * * * is found * * * necessary to the maintenance of the national health, safety, or interest."

Pursuant to Section 10 of the act, 50 U.S.C.A.Appendix, § 310, local boards, which were thereafter commonly known as the Selective Service Boards, were set up in each county and city and one of the duties and powers specifically assigned to such boards was "to hear and determine * * * all questions or claims with respect to inclusion for, or exemption or deferment from, training and service." 50 U.S.C.A. Appendix, § 310(a) (2).

Further we find that these selective service boards were directed by the statute to defer from service in the armed forces any person found to be engaged in an agricultural occupation or endeavor essential to the war effort, so long as the registrant remained so engaged. 50 U.S.C.A.Appendix, § 305(k). And the local boards were instructed on this matter in the following language:

"On the local board is placed the responsibility of deciding which men should be deferred because of their civilian activities. It is in the national interest and of paramount importance to our national defense that civilian activities which are contributing to the national health, safety, and interest should be disrupted as little as possible, consistent with the fundamental purpose of the Selective Service Act." Executive Order 8560, Oct. 4, 1940; Federal Regulations 1940, p. 4441, Sect. 603.350.

It appears that the original act (as approved Sept. 16, 1940), while affording an opportunity for voluntary enlistment in the armed forces, specifically provided that no volunteer should be accepted for induction so long as he was in a deferred classification. Sect. 3(a), Selective Service Act of 1940, 50 U.S.C.A.Appendix, § 303(a). But it further appears that by Executive Order 9279, Dec. 5, 1942, 50 U.S.C.A.Appendix, § 310 note, all voluntary enlistment was abolished and entry into the armed forces was permitted only under the provisions of the Selective Service Act. This same Executive Order transferred the Selective Service System to the authority of the War Manpower Commission. The purpose of this action was, as recited in the order, "In order to promote the most effective mobilization and utilization of the national manpower * * *," and the order went so far in dealing with civilian workers as to require that all hiring of workers in any occupation deemed essential to the war effort be done through the United States Employment Service and to forbid any employer to retain in his employ any worker whose services were more urgently needed in any other establishment or occupation.

The reference to these scattered provisions of the statutes and executive orders dealing with the conduct of the war have been made to point up the extent to which governmental authority was exercised to fix the part which every citizen should play in the war effort, and the narrow limits within which a citizen might follow his own desires. It was the purpose of the

government to assign each registrant to that form of effort, whether in the armed forces or in a civilian occupation, where his services would be of greatest benefit to the nation. We did not have complete conscription of our manpower but about the only way in which we stopped short of it was in not applying to those selected for essential civilian work the compulsory service therein that was applied to those selected for the armed forces.

All of the statutes and regulations which have been cited above were in effect in August, 1945, when the plaintiff severed his employment with the defendant and his case must be examined in the light of them. Beginning with his first classification by his local board, the plaintiff was classified as engaged in a civilian occupation essential to the war effort (Class II-A) and was deferred from military service for that reason. Under the regulations governing classification of registrants (Executive Order 8560, Oct. 4, 1940; Federal Regulations, 1940, P. 4441, Sect. 603.353) it was required that the status of all persons in Class II-A be re-examined every six months in order to determine whether deferment should be extended or whether the registrant should be re-classified. Pursuant to this the case of the plaintiff was considered at appropriate intervals over a period of over three years and on each occasion he was deferred from military service and classified as engaged in a civilian occupation essential to the war effort.

It appears that the original classification of plaintiff, as well as the repetitions thereof, were upon the request of his employer, the defendant. So far as appears the plaintiff himself at no time requested or sought the classification in which he was placed; and it is suggested that the plaintiff was at all times desirous of entering the armed forces and that his deferment was contrary to his own wishes. Assuming this to be true, it merely serves to emphasize the fact that the nature of the services rendered by a citizen during the war was not one to be determined solely by his own choice but was subject to determination by the Government acting through local boards.

At the time the plaintiff resigned his position with defendant, on August 9, 1945, he was classified as being in a civilian occupation essential to the war effort, a status which (except for his resignation), would have continued at least until September 26, 1945, to which date his then deferment extended. It might have, and, judging by prior happenings, probably would have been further extended. In this situation, and while holding this deferred status, the plaintiff severed his employment with the defendant by resigning. His purpose, as he stated in his letter of resignation, was in order to "establish myself in a non-essential status, so I might be drafted into military service * * .*." One may sympathize with the attitude of the plaintiff in desiring to serve in the armed forces rather than in the quiet and safety of civilian work; but the fact remains that when he had been assigned to civilian work by an authority empowered to make such assignment and which had determined that his services in civilian work were essential to the war effort, he refused to acquiesce in this determination and sought to avoid it. The only means by which he could accomplish this was by a severance of employment with defendant, and this step he took.

■ The question is whether the plaintiff is, within the meaning of the statute (Selective Service Act of 1940, § 8, 50 U.S.C.A.Appendix, § 308(b), a person "who, in order to perform such training and service, (i. e. in the land or naval forces) has left or leaves a position * * * in the employ of any employer * * *." I am of opinion that he is not. The statute must be construed in accordance with its language and its intendment, and no sympathetic feeling for plaintiff can justify extending it beyond its meaning. Within this meaning the plaintiff did not leave his employment in order to perform service in the armed forces. At the time he left his employment, it was impossible for him to enter such service. He could not be drafted into the service because he occupied a deferred status, and he could not enter as a volunteer because voluntary enlistments were no longer ac-

cepted. So long as he continued in the position which he occupied on August 9, 1945, the plaintiff was not eligible for service in the armed forces. Only by divesting himself of his deferred status could he hope to become eligible and this he could accomplish, and did accomplish, only by resigning from defendant's employ. The most that can be said is that plaintiff left his position in the hope and expectation that by so doing he would at some time in the future be called to and inducted in the military service. The plaintiff's letter of resignation states his reason for leaving his position to be "In order that I can establish myself in a non-essential status, so that I might be drafted into the military service." He did not leave his employment in order "to perform such training and service." He left it in order to acquire a non-deferrable status which he hoped would lead to the performance of training and service at some later time. His hopes were realized and he was finally inducted for "training and service" on October 8, 1945; but at that time he was not an employee of defendant and had not been for approximately two months.

In reaching the conclusions here set out the court has not overlooked the cases of McCarthy v. M. & M. Transportation Co., 1 Cir., 160 F.2d 322, cited by defendant; nor the cases of Boston & Maine R. R. v. Hayes, 1 Cir., 160 F.2d 325, and Boston & Maine R. R. v. Bentubo, 1 Cir., 160 F.2d 326, from the same court, and cited on behalf of plaintiff. The first of these appear to support the view here reached. The latter two cases on the surface appear to be contrary to my conclusions. However, from the opinions in these cases in the District Court (in 66 F.Supp. at pages 371 and 910 respectively) it appears that the facts were substantially different from those of the instant case with regard to the status of the registrant at the time of his resignation of his employment and the connection and direct sequence of the resignation and the entry into military service. In any event I am of opinion that the facts of the instant case do not bring it within the intent of the statute, and that the action will have to be dismissed.